Filed 10/24/25  P. v. Debem CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TONY ERIC DEBEM,<br><br>    Defendant and Appellant. | F088232<br><br>(Super. Ct. No. VCF449660)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Jeffrey S. Cross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney, Amanda D. Cary, and Lewis A. Martinez, for Plaintiff and Respondent.

-ooOoo-

On March 18, 2024, defendant Tony Eric Debem, was convicted of, inter alia, two counts of sexual intercourse or sodomy with a child ten years old or younger. On appeal, defendant argues that there was insufficient evidence to support his conviction on those charges. We affirm.

## PROCEDURAL HISTORY

On March 12, 2024, the District Attorney of Tulare County filed an amended information charging defendant with sexual intercourse or sodomy of a child ten years old or younger (Pen. Code,[1] § 288.7, subd. (a); counts 1, 2). Trial commenced the following day.

On March 18, 2024, defendant was found guilty by a jury on counts 1 and 2, as well as other related charges. Defendant was subsequently sentenced to a term of 25 years to life.

On June 18, 2024, defendant filed a notice of appeal.

## FACTUAL SUMMARY

Defendant and his girlfriend, Carolina G., were in a relationship for eight or nine years prior to the events which were the subject of the charges. They had three children together and Carolina had an older child, B.G., from a previous relationship. B.G. was nine years old at the time of those events.

On Saturday, December 2, 2023, B.G. was at the family residence with defendant, her mom and the other children. While Carolina and the others were asleep, defendant sexually abused B.G. The details of that sexual abuse, as B.G. would later describe them to a child forensic interview specialist and in her subsequent trial testimony, will follow. At the time of this first event, B.G. told no one what had happened to her and what defendant had done, not even Carolina.

---

[1] Undesignated statutory references are to the Penal Code.

The following weekend, on Saturday, December 9, 2023, defendant again sexually abused B.G. in the family home while her mom and the youngest children were sleeping or otherwise unaware. The details of that second event, as later described by B.G., will follow. As before, B.G told no one what had happened to her.

Two days later, on Monday, December 11, 2023, B.G. returned home from school and noticed that there was blood in her "pee." She told Carolina about the blood and Carolina asked her if she was alright. In response, B.G. revealed to her mother everything that had happened to her on the two previous Saturdays. At the time B.G. told her mother what defendant had done, he was not at home, but at work.

Immediately after learning what B.G. had told her, Carolina telephoned defendant's sister, Teresa, with whom she was close. Teresa, at the time, lived in El Paso, Texas. Shortly after that call, Teresa telephoned her brother, Ricky, who forthwith called law enforcement to report what he had learned.

Later that same evening, Deputy Daniel Castillo of the Tulare County Sheriff's Department was dispatched to the family home to check on the welfare of the family, and in particular B.G. He arrived shortly before 7:00 p.m. and knocked on the door several times, but got no answer. He called Ricky to find out if anyone was at home and Ricky told him he had just spoken with defendant and he was at home. Castillo returned and knocked again and defendant answered.

Castillo began by asking if everything was okay and defendant assured him that everything was fine. Castillo then spoke with Carolina, who also assured him that everything was fine and that everyone in the house was okay. Castillo asked to speak to B.G. and Carolina went inside to wake her up. Castillo then spoke with B.G., in her bedroom, alone. Castillo asked her if she was okay and she said she was, that everything

3.

was fine and that she was okay. Castillo asked if she would feel more comfortable to speak with someone else and B.G. declined that offer.

Castillo then telephoned Teresa to discuss what he had learned from dispatch, and in particular what she had learned earlier that day in the phone call from Carolina. After speaking with Teresa, Castillo returned to the residence and again asked to speak with Carolina. Again Carolina assured him that everything was fine and that "all her kids" were okay.

Shortly thereafter Detective Sarah Mendes arrived and took over the investigation of the matter. Defendant was arrested that same evening and taken into custody. He remained in custody up to and including the completion of his trial.

### *Examination By SART Nurse*

Early the following morning, December 12, 2023, B.G. was examined by Crystal Gomez, a sexual assault response team nurse. Carolina was present during that examination and consented to allow it.

Gomez testified that she examined B.G.'s external genitalia, including the areas in and around her vagina and anus. She performed no internal examination of B.G.'s genitalia. She found no evidence of injury or trauma. She noted the presence of blood in her genital area, but was unable to find any injury associated with that blood. Having observed softening in her hymen, she opined that the blood was consistent with the pre-menstrual changes she saw in the hymen. In an effort to examine the marginal areas of the hymen more closely, she asked Carolina for permission to use a "moist, soft, Q-tip" to pull back the folds of the hymen. Carolina denied her that permission.

Gomez testified that it was not unusual, in her experience, in cases where an adult male had penetrated a child, to find no external injury or trauma. She noted that this was particularly true where it was unknown the depth to which penetration was made.

4.

Gomez testified that she swabbed several areas of B.G.'s genitalia in an effort to identify and preserve any forensic evidence. She identified all the areas she had swabbed and preserved those swabs for later analysis. Based on the testimony of forensic experts at the trial, the jury was told that a "single male DNA allele" was detected on the swab taken from B.G.'s vulva. It was also learned the single male allele was insufficient to allow for either interpretation or comparison, since a full male DNA profile would consist of 25 markers, with a single allele on each of those markers.

### *Forensic Interview of B.G.*

Later that same day, December 12, 2023, B.G. was interviewed by Danielle Gallamore, a child forensic interview specialist. That interview was videotaped, received in evidence at trial along with a transcription, and played for the jury.

After explaining to B.G. the importance of telling the truth and obtaining her promise to only tell the truth, Gallamore asked B.G. to tell her what happened between her and defendant on Saturday, December 2, 2023. B.G. explained that she was at home lying on a mattress in the living room with defendant. Her mother and the other children were asleep and she was drawing pictures. She described how defendant removed his pants and underwear, removed her pants and underwear, placed her in a "crawling" position, and lifted her hips and butt. While in that position, defendant "put his private part in [her] private part." When asked which private part his private part went into, she answered, "I just call it my butt." On further questioning, B.G. clarified that she was talking about the part where "[she] go[es] poop." When asked how she knew it went inside, she responded, "Because he did pull my pants down and he put his private part right in it."

Gallamore then asked B.G. to describe what happened the second time, the Saturday just past. B.G. described this event as occurring in her bedroom. She explained

that she and defendant were lying in bed watching TV, her mother and the younger children were asleep and her little brother was asleep in her bed. She described how defendant removed his own clothes, as before, and took off her pants and underwear. As before, he again placed her in a "crawling" position and lifted her butt and hips. He then put his private part into "the same spot." Upon further questioning, she confirmed that it "went in the same" as before.

Gallamore then asked B.G. about the events of December 11, 2023, when she got home from school and told her mom what happened. B.G. told Gallamore that defendant was at work when she got home from school and explained that after finding blood in her "pee" she revealed to her mom what had happened the two previous Saturdays. She said that after she told her mom, her mom telephoned defendant. B.G. overheard Carolina tell defendant everything B.G. had just told her.

B.G. related that when defendant got home, he greeted the other children but not her. She said she was "bummed." She said that defendant then went into another room with her mom and closed the door. They began to "fight."

B.G. said she went to bed and Carolina woke her up and told her the police wanted to talk to her. She got up and spoke to an officer and told him everything was fine and that she was okay. She described being worried and uncertain what defendant would do.

### B.G.'s Trial Testimony

At trial, B.G. testified concerning the two incidents described in her interview with Gallamore. She described the incidents on two consecutive weekends, the first on Saturday, December 2, 2023, and the second the following weekend. She repeated her earlier statements about the first incident occurring in the living room and the second occurring in her bedroom. She described how on each occasion defendant first took off his clothing and then hers, placed her in a crawling position, and lifted her hips and butt.

6.

As to the first incident, B.G. testified that defendant put his private part "between [her] legs," but "did not touch her butt." She denied that his private part touched the area where "poop comes out."

As to the second incident, B.G. testified that defendant's actions were "the same" as on the previous Saturday. However, she testified that on the second occasion defendant did not put his private on her and denied that his private part touched her butt "at all."

## DISCUSSION

### I.     Applicable Law and Standard of Review

"Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony." (§ 288.7, subd. (a).) "Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. [Citations.] Sodomy similarly requires penetration [of the anus], however slight." (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 79.)

In the instant case, the jury was properly instructed that defendant could not be found guilty of the crimes charged in counts 1 or 2, violation of section 288.7, subdivision (a), unless the People had proved, beyond a reasonable doubt, that defendant's penis had penetrated the vagina or anus of B.G. (CALCRIM No. 1127.) At the request of both counsel, the trial court gave the jury an additional "pinpoint" instruction on the element of penetration. That special instruction No. 1 stated, "An intrusion into the space between a person's buttocks while perhaps a necessary step on the path to intrusion of the anal opening, is not, itself, an intrusion into the anal opening."

Defendant argues on appeal that there was insufficient evidence to support convictions on counts 1 and 2 because the record lacks sufficient evidence defendant's penis penetrated either B.G.'s vagina or anus.

When evaluating a sufficiency of evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) And we " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid.*) " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

## II.    Analysis

Defendant argues the evidence of penetration was insufficient because B.G. testified at trial that his penis did not touch her anus on either of the two occasions charged, but just went between her legs. He acknowledges B.G.'s statements to Gallamore, but argues that her trial testimony simply "clarifi[ed]" her earlier statements to Gallamore, but did not conflict with those statements.

At the conclusion of the evidence, the jury was properly instructed with several pertinent statements of law. The jury was first instructed as follows: "You alone must judge the credibility or believability of witnesses. In deciding whether testimony is true

and accurate, use your common sense and experience.…  [¶]  You may believe all, part or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe.  [¶]  In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:  [¶] … [¶]  Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony."  (CALCRIM No. 226; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1184, 1188.)  They were also instructed, "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe."  (CALCRIM No. 302; *People v. Lee* (2011) 51 Cal.4th 620, 632 [" 'it is the exclusive province of the … jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "].)  Finally, they were instructed, "You have heard evidence of statements that a witness made before the trial.  If you decide that the witness made those statements, you may use those statements in two ways:  [¶]  1. To evaluate whether the witness's testimony in court is believable; [a]nd [¶] 2. As evidence that the information in those earlier statements is true."  (CALCRIM No. 318; *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1038.)  Any inconsistencies or conflicts in the testimony are for the jury to resolve. (*People v. Smith* (2005) 37 Cal.4th 733, 739).

As the Attorney General has noted, in the forensic interview the day following defendant's arrest, B.G. stated defendant put his private part "inside her 'butt.' "  She clarified that in referring to her butt, she meant the place she used to "go poop."  She told the interviewer defendant did the same thing on the second occasion, putting his penis in "the same spot."  The Attorney General argues that this evidence alone was sufficient to prove penetration on both occasions.  We agree.  Indeed, the trial court, denying defendant's section 1118.1 motion on the same grounds, noted the sufficiency of B.G.'s

9.

out of court statements concerning penetration, should the jury choose to believe those statements.

Whether, as defendant argues, B.G.'s testimony simply clarified her out of court statements to Gallamore, or was in direct conflict with those statements, was a question for the jury to decide. Out of court statements inconsistent with trial testimony need not be contradictory with a witness's testimony, they need only be " ' " 'inconsistent[] in effect' " ' " with that testimony. (*People v. Cowan* (2010) 50 Cal.4th 401, 462–463.)

As earlier noted, we do not independently weigh the evidence to determine whether a conflict existed between B.G.'s testimony and her out of court statements, or decide the credibility of her statements. All those were matters left to the jury to decide. This court is required to defer to the jury's resolution of any conflicts in B.G.'s testimony and their determinations as to the weight to be given to her statements and her credibility.

Defendant argues that it is "thoroughly implausible" that B.G. would have reason to contradict her statements to Gallamore in her testimony in trial. He surmises that she would have no reason to know that by denying defendant had put his penis in her butt, defendant might obtain some more favorable result. Even if defendant were correct in that assumption, a review of the entire record reveals evidence from which the jury could reasonably and logically conclude that Carolina might have reason to know that such testimony, at trial, might benefit defendant.

Although there was no direct evidence that Carolina influenced B.G.'s testimony on the subject of penetration, there was substantial evidence from which the jury could reasonably and logically draw that inference. The jury heard substantial evidence that Carolina, from the very outset of the police investigation, made efforts to protect defendant at the expense of B.G., her own daughter. After hearing from B.G. about what defendant had done to her, Carolina nevertheless told Deputy Castillo, at two separate

10.

times, that everything was fine and that all the children were okay. Moreover, B.G. testified that even after she and the other children were removed from Carolina's custody, Carolina continued to telephone her, encouraging her to lie in court, to say that defendant had not done anything to her. B.G. told the jury that her mom's efforts to get her to lie happened two or three times and upset her because she wanted to tell the truth. In one of those phone calls in which Carolina encouraged her to lie about what defendant had done, B.G. testified that her mother told her they would have a "deep talk" at some later time.

In addition, the jury heard evidence from which they could reasonably and logically conclude that Carolina had not only attempted to influence B.G.'s trial testimony, but that her efforts were in fact successful. The jury heard and saw evidence that little more than a month before the trial, on February 8, 2024, Carolina made a Facetime call to defendant in jail. All the children were present during the call, including B.G., who appeared in the video holding a cupcake with a candle to celebrate defendant's birthday. When asked in court whether she had seen defendant since his arrest, she denied it. When asked if she had ever joined the other children in one of Carolina's Facetime calls to defendant while in jail, she denied it.

In sum, there was more than sufficient evidence from which the jury could reasonably and logically conclude that B.G.'s denial that defendant had put his penis in her butt was likely influenced by her mother's efforts to have her lie in court, and that B.G.'s statements to Gallamore were true.

The Attorney General has cited *People v. Tompkins* (2010) 185 Cal.App.4th 1253 (*Tompkins*) in support of the argument that B.G.'s out of court statements alone were sufficient to support the jury's verdicts on counts 1 and 2. In *Tompkins*, the defendant was charged with digital penetration of a child on two separate occasions. (*Id.* at p. 1256.) Before trial, the child told police that she was penetrated two or three times.

11.

(*Id.* at p. 1257.)  At trial, she testified she was penetrated one or two times.  (*Ibid.*)  On appeal, the defendant contended the evidence was insufficient to convict him on both counts, arguing that the child's trial testimony allowed for the inference that penetration had only occurred once.  (*Id.* at pp. 1260-1261.)  The appellate court held that the jury was not bound to accept the child's testimony at trial as true, noting that her out of court statement to the police was sufficient to convict on both counts.  (*Id.* at p. 1261.)

Defendant contends that *Tompkins* is inapposite.  He distinguishes the instant case from *Tompkins*, arguing that B.G.'s statements were in "stark contrast" with each other on the issue of penetration, telling Gallamore that defendant had put his penis into her butt and telling the jury that he did not put it in her butt, whereas the statements of the child in *Tompkins* could be reconciled to support both charges, allowing that either statement supported two separate penetrations.  Defendant implies that because B.G.'s statements on the issue of penetration cannot be reconciled, *Tompkins* is therefore inapposite.

Defendant suggests a distinction should be drawn between out of court statements which can be reconciled with trial testimony and those which are irreconcilable with the testimony.  He argues a distinction without a difference.  He offers no explanation why a jury's resolution of irreconcilable inconsistencies in the evidence would be entitled to any less deference on appeal.  We are aware of no authority, and defendant cites none, which supports that illogical notion.

In *Tompkins*, the appellate court held that any inconsistency in the child's statements went to the weight and credibility of the evidence, and the jury's resolution of that inconsistency cannot be disturbed on appeal.  (*Tompkins*, *supra*, 185 Cal.App.4th at p. 1261.)  *Tompkins* is entirely apposite to the case on appeal here.  For that reason, this court finds that any inconsistency in B.G.'s statements went to the weight and credibility

of the evidence, and the jury's resolution of that inconsistency cannot be disturbed on appeal.

Accordingly, substantial evidence supports the convictions, and defendant's claim fails.

## **DISPOSITION**

The judgment is affirmed.

ELLISON, J.*

WE CONCUR:


PEÑA, Acting P. J.


SNAUFFER, J.

---

\* Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13.